CLAYTON O. EAKLE, Admr., et al. vs. FRANK T. HAGAN.

*Mortgages—Proof of Payment—Laches.*

Upon a petition to restrain the enforcement of a decree for a sale under a mortgage entered more than twelve years previously, the evidence examined and *held* to be sufficient to prove that the mortgage had been paid although no release thereof was entered, and the decree for sale had not been vacated.

When a mortgagor remains in undisturbed possession of the property for more than twelve years after the maturity of the mortgage, which he alleges was paid, he is not to be charged with laches because he did not cause the mortgage to be released on the record.

Appeal from the Circuit Court for Washington County (ROBERT R. HENDERSON, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCMUCKER, JJ.

*J. Clarence Lane* and *Henry H. Keedy, Jr.*, for the appellants.

*Chas. D. Wagaman* (with whom was *Frank G. Wagaman* on the brief), for the appellee.

FOWLER, J., delivered the opinion of the Court.

On the 9th of June, 1881, Frank T. Hagan and his wife, Susan Hagan, executed a mortgage on a farm owned by the latter to William Miller to secure the payment of a note for $1,350. Both were dated 9th June, 1881, and payable on the first of April, 1883.

Subsequently, and after some payments had been made on the mortgage debt and note, they were assigned to Washington C. Eakle, the brother of Mrs. Hagan. The assignee filed a bill in the Circuit Court for Washington County against Hagan and wife for a sale of the mortgaged premises and a de-decree was passed by that Court on 7th of December, 1892, providing for a sale unless the amount found to be due should be paid into Court on or before the day named in said decree. No further steps appear to have been taken in the proceedings just mentioned until the 16th March, 1904, when the death of the plaintiff, Washington C. Eakle, was suggested, and his administrator, Clayton O. Eakle, was made a party plaintiff. Mrs. Hagan, one of the defendants had also died in the mean · time, and an order was passed directing J. Clarence Lane, trustee, to execute the decree of December 7th, 1892, for the sale of the mortgaged premises. When the property was advertised for sale in accordance with the provisions of the decree just mentioned, the surviving defendant, Frank T· Hagan, filed a petition in the cause asking that the plaintiff administrator and the trustee named in the decree be enjoined from selling the lands mentioned in the mortgage.

The chief allegations relied on to secure interposition of the Circuit Court by injunction were first, that the decree for the sale of the mortgaged premises had laid dormant and unexecuted from the date of its passage, to-wit, the 7th December,

1892, to the 16th March, 1904—a period of over twelve years, and, second, that in September, 1899, the mortgagor, Hagan, settled and paid to the plaintiff Washington C. Eakle, all of the balance of the mortgage debt and interest thereon due and owing to the time of said settlement.

The defendants answered admitting all the material allegations of the petition, except that of settlement and payment of the balance of the mortgage debt which is specifically denied, accompanied by the allegation that the petitioner, Hagan, never set up such claim of payment until after the death of said Washington C. Eakle. The case was heard upon bill, answer and testimony and the injunction theretofore issued was made perpetual. From this decree the trustee named in the decree for the sale of the mortgaged premises and the administrator of the assignee of the mortgage have appealed, and it is conceded by both sides that the only question presented is the payment *vel non* of the mortgage debt. In other words we have a question of fact which must be solved by the testimony we find in the record.

It is unfortunate that the enforcement of the decree for the payment of the mortgage claim was postponed until all of the original parties to the mortgage and the note thereby secured have died, except the mortgagor Hagan, and his testimony is excluded by reason of the statute which renders him an incompetent witness because of the death of the other party to the contract. It is, of course, a misfortune to the estate of the assignee of the mortgage that he is not alive to testify, but his death also works an equal hardship on the surviving mortgagor who is thereby prevented from adding his testimony to that of the two witnesses on whom he relies to show that he settled and paid the mortgage claim in September, 1899.

It is not always possible to come to an absolutely satisfactory conclusion on questions of fact like the one before us on this appeal. As was said by the Supeme Court of Michigan in *Wakeman* v. *Akey*, 29 Mich. 309, a case cited and relied on by the appellant, "In determining the force and credit of testimony no technical rules can be of much service. Every

Court must decide upon facts according to the belief which results from the proofs, and their actual effect upon the judgment of the tribunal weighing them. Much respect will always be due to the opinion of the Judge who decides the the cause below with more or less presumable knowledge of the witnesses." The learned Judge below in a lucid and careful opinion found that the testimony supported the petitioner's contention that he had settled and paid the mortgage and it only remains for us to ascertain, whether the facts on which he relied support his conclusion.

Only two of the witnesses, the petitioner himself as we have said being excluded by the statute, and the assignee of the mortgage being dead, gave any direct testimony in relation to the alleged settlement, these two witnesses being John H. Nicodemus and Frisby Griffith.

It appears from the testimony that Hagan carried on a blacksmith's shop near Eakle's Mills and that Washington C. Eakle lived in the same neighborhood. They had mutual dealings quite independent of the mortgage. They conducted a fruit raising business jointly and Eakle patronized Hagan in the blacksmithing business. Sometime in September, 1899, the witnesses thought about the 10th or 15th, Messrs. Eakle and Hagan met at the latter's shop for the purpose of settlement. They both had their books of account and while they were comparing them the witness, John H. Nicodemus, was going in and out of the shop. But in order to get the exact value of his testimony, we here reproduce it: After stating that he had known most of the parties since childhood, he testified that he was both a blacksmith and a wagon-maker and that in September, 1899, he was working at Mr. Hagan's shop, when Washington C. Eakle and Hagan had a settlement of their affairs. He thus describes the settlement: "It was in 1899, in September. I was working at Mr. Hagan's then putting a rim on a broad-tread wheel and while they were settling up I took corners off the rim. I heard they were settling, and after I had taken the corners off the rim I went on the outside of the shop and was putting the rim on the

wheel and after they were through Mr. Hagan wanted something to show for their settlement. Mr. Eakle said to me come in here and I went in the shop and Mr. Eakle said he wanted me for a witness that he and Hagan had settled in full for once ; he said Frank and I are square and he said there were some papers *and the mortgage* up in Hagerstown, and Mr. Eakle said he would be up in Hagerstown in a few days and he would bring it down and then Mr. Hagan could get it at the store sometime. On cross-examination the witness said: "They were just going on with the settlement and just like any person else, of course I could not tell you just what they said, I heard they were settling. Mr. Hagan would read off his book so and so ; and Mr. Eakle would say so many baskets of grapes, so many crates of peaches ; so many cantaloupes, that was the way it was going on. Mr. Hagan would go on and read what he had charged against him, for shoeing and blacksmithing the same as anybody else would. That was about all that I could hear as I went on with my work. That is about all I can say about it \* \* \* Mr. Eakle called me to witness this. He said me and Frank (Hagan) have settled and are square for once. That is about all he said. Then Mr. Hagan said he wanted Mr. Eakle to give him something to show it and Wash. (Eakle) said I have not got your papers here, but here is Pinty (the witness) and I am going to Hagerstown in a couple of days, and he said he would get the papers and the mortgage, and you can get them sometime when you come down to the store." That there was a settlement of some kind between the parties at the time indicated is we think sufficiently clear from the testimony. Both witnesses testify to it with absolute clearness, indeed the argument of the appellant, or one phase of it, at least, concedes that there was a settlement between Eakle and Hagan, but it was contended that this settlement related only to their other transactions outside of and independent of the mortgage. But this hardly seems probable. It is true they had their books there, each showing items charged against the other. There ought not to have been and perhaps was not, any difficulty in the mutual settle-

ment and acquittances so far as their mutual dealings were concerned. This may have been done by entries in their respective account books; but when it came to the mortgage that was another matter. The books had nothing to do with the mortgage, and it is entirely reasonable to suppose that both Nicodemus and Griffith were called to witness as to the settlement of the mortgage. At any rate Nicodemus so swears—and we cannot disregard his testimony unless we brand him not only as a shameless liar but a perjurer as well. And this we are asked to do without sufficient evidence to justify such a course. This witness also testified that the money paid by Hagan to Eakle was counted out in his presence, and when asked on cross-examination whether there was anything said about any notes he replied: "The way I understood it there were some notes in Hagerstown and I thought that they were the papers with the mortgage that I have spoken of. That is the way I understood it at the time." There was another witness, Frisby Griffith, who corroborates the witness Nicodemus as to the fact of the settlement and the place where it was consummated. He also was called by one of the parties, Eakle, to witness that Hagan "had paid all that he owed him." And when asked why he remembered it, he replied because he was told by Hagan that he must not forget it. It seems to us that the testimony of this witness bears upon its face the unmistakable imprints of truth, and it is to be regretted that he was not able to testify clearly as to the scope of the settlement between Eakle and Hagan. It is true he says Hagan paid to Eakle *all that he owed him*, and *that* was what he was called upon to witness; but, inasmuch as there were transactions between them independent of the *mortgage*, it is possible that it, so far as this witness' testimony is concerned, was not included therein. But how is it possible to ignore the clear and uncontradicted testimony of the witness Nicodemus? He swears to the settlement and payment; he gives convincing details as to the time and place and surrounding circumstances, he declares that he was called in to witness that very thing, the notes and mortgage as well, were included

in the settlement. If the testimony of Nicodemus stands, the case of the appellant must fall; and therefore, in the first place, he is assailed as unworthy of belief. But we entirely agree with the learned Judge below that the attack upon his credibility was by no means sustained. Not only was this direct attack upon the witness in question unsuccessful, but the surrounding circumstances are not, in our opinion, so controlling against it as was contended by the appellant. We have already adverted to the fact that while the death of the appellant's decedent had closed his lips, so also it prevents the appellee from testifying. It was urged with great force by the learned counsel for the appellant that it was difficult to believe that the appellee had on hand in his shop such a large amount of money as was required to pay the mortgage debt; but perhaps if the appellee had been allowed to testify he could have explained this apparent difficulty and many others that were suggested. As was said by the Court below : "It would have been much more satisfactory to the Court if the entries in the books could have been introduced in evidence, as they might possibly have reduced the cash balance due, very considerably, and to some extent have explained the improbability of the possession of so considerable a sum by Hagan unaccounted for." It must not be forgotten, too, that Nicodemus swears he saw Hagan pay money (how much he did not know), to Eakle. In conclusion, we advert to a fact which it is difficult to reconcile with the non-payment of the mortgage. For nearly twelve years no steps were taken to enforce its payment, although a decree was in existence all the time under which the property could have been sold. As an excuse for this delay it was suggested that Mr. Eakle did not wish to sell his sister's property, but it must be remembered that he outlived her nearly four years during which time he never took any steps to enforce the payment of his mortgage. After his death, the claim is pressed. Each side accuses the other of delay and *laches*. Whatever may be said as to the appellant, whether guilty of laches or not, certainly the appellee cannot be so charged. He is and has always been in possession of

the mortgaged property, and there was no reason why he should take any action so long as his possession remained undisturbed. 18 *Am. & Eng. Ency.*, 124, &c. Upon the whole case, although it would have been more satisfactory to have had the testimony of the original parties to the mortgage as to the alleged settlement and payment thereof, we are constrained as was the learned Judge below, to hold that the testimony must be accepted as establishing the payment of the mortgaged debt and hence the decree appealed from will be affirmed.

*Decree affirmed with costs.*

(Decided March 24th, 1905.)